UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

JAMES D. BURKETT,                    )
                                     )
           Plaintiff,                )
                                     )
     v.                              )  Case No. 2:11CV94 FRB
                                     )
CAROLYN W. COLVIN,[1] Commissioner   )
of Social Security,                  )
                                     )
           Defendant.                )


**<u>MEMORANDUM AND ORDER</u>**

This matter is before the Court on plaintiff James D. Burkett's appeal of an adverse decision of the Social Security Administration.  All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.   Background and Procedural History

Plaintiff James D. Burkett applied for Disability Insurance Benefits ("DIB") pursuant to Title II, and Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 401, et seq. (also "Act"), alleging that he became disabled on April 2, 2007.  (Administrative Transcript ("Tr.") at 113-20).  Plaintiff's applications were denied, and he

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should therefore be substituted for Michael J. Astrue as the defendant in this case.  No further action needs to be taken to continue this suit by reason of the last sentence of 42 U.S.C. § 405(g).

requested a hearing before an administrative law judge ("ALJ"), which was held on April 9, 2010. (Tr. 38-61). On August 17, 2010, the ALJ issued an unfavorable decision. (Tr. 13-37). Plaintiff then sought review from defendant Agency's Appeals Council, which denied plaintiff's request for review on November 8, 2011. (Tr. 1-5). The ALJ's decision thus stands as the Commissioner's final decision subject to review in this Court. 42 U.S.C. § 405(g).

## II.   Evidence Before The ALJ

### A.   Plaintiff's Testimony

Plaintiff, 39 years of age at the time of the administrative hearing, testified that he had lived with his wife and teenage son in the same residence for the past eleven years. (Tr. 43). He completed the eleventh grade, and received no vocational training. (Id.) He had been the owner and operator of a painting business, and had past work experience as a concrete worker, a prep cook, a spool setter, and steel worker. (Id.) The ALJ asked plaintiff whether, since his alleged onset date of April 2, 2007, he had "worked anywhere for anybody including any kind of self-employment income," and plaintiff replied, "[n]o, I haven't, Your Honor." (Tr. 44). In response to follow-up questions from the ALJ, plaintiff denied doing anything for anyone in exchange for compensation other than money, and denied that he had worked even part time or even for just part of one day. (Tr. 45).

Plaintiff testified that he began having problems before he stopped working. (Tr. 45). He explained that he had pain going down his legs and up his back, and that it was worse in his lower

back.  (Id.)  He testified that injections had not helped.  (Tr.
45-46).  He testified that he was currently seeing Dr. Beckman but
was not taking pain medication because Dr. Beckman was concerned
about the addictive nature of it.  (Tr. 46).

        Plaintiff testified that he had sleep apnea and used a
"BiPap" machine every night, which was paid for by Medicaid.  (Tr.
46).  Plaintiff initially testified that he had no problems during
the day that he attributed to sleep apnea.  (Tr. 46-47).  However,
upon questioning from his attorney, he testified that he felt tired
during the day, and was sometimes unable to use the BiPap machine
because it blew air into his eyes.  (Tr. 47).  Plaintiff testified
that he "had to go see a eye doctor to fix my eye now because the
mask isn't working for me" and explained that the mask did not fit
properly and might cut off the blood stream to his brain, so he had
to wear it loose.  (Id.)

        Plaintiff testified that he had back pain when he woke in
the morning.  (Id.)  He testified that he could stand for thirty
minutes before experiencing numbness in his legs and swelling in
his ankles.  (Tr. 48).  He testified that he sat in a recliner for
a couple of hours to relieve these symptoms.  (Id.)  He testified
that he could sit for 30 to 45 minutes before needing to lay down.
(Id.)  He testified that he spent six hours per day in a recliner
or lying down.  (Id.)  When asked "have you had problems with your
hands?" plaintiff replied "No, not - - no, I haven't.  But just
recently I have."  (Tr. 49).  When asked what he meant by "just
recently" plaintiff replied that his hands were "starting to swell

- 3 -

up and - - ." (Id.) Plaintiff testified that he saw a specialist "yesterday" who took x-rays but did not yet have results. (Id.)

Plaintiff testified that Dr. Beckman prescribed medication for bipolar disorder, but denied seeing a psychiatrist for that condition. (Id.) Plaintiff testified that bipolar disorder caused irritability, and that he could not "stand to be around [his] wife or anybody because of that. When I hurt so bad I just don't want to be around nobody." (Tr. 49-50).

Plaintiff testified that he cooked for his family for about 20 to 30 minutes, but did not do dishes because he could not stand up. (Tr. 50). He testified that he did not do any house cleaning or laundry, did not take out the garbage, did not do yard work, did not shop, or engage in hobbies, and stated that he "quit doing everything." (Tr. 51). He drove "[a]t times" but stated that his wife sometimes had to drive due to swelling in his back and numbness in his legs. (Id.) Plaintiff was then asked how many times he drove during the course of one week, and he replied: "I'd say maybe three times a week because of my sleep apnea. I've had two wrecks almost because of it." (Id.) He visited people for short periods of time before returning home to lay down. (Tr. 52). He belonged to a church but stopped going because of problems sitting, explaining that "[o]nly about 45 minutes and I'm already wanting to leave." (Tr. 52-53). He ate out "[e]very now and then." (Tr. 53). He testified that he got along with people better now than he did before, which he attributed to medication. (Tr. 53). Plaintiff testified that, with medication, he did not

have anxiety around other people, and stated "[a]ctually I feel a lot better and my marriage is getting along a lot better." (Id.) He attributed drowsiness to the medication. (Id.) He was able to keep up with his own appointments. (Id.) He testified that his wife helped him put on his socks and sometimes helped him wash in the shower. (Tr. 54).

Plaintiff testified that he "quit" using a computer "because my hands they hurt so bad I can't do it now." (Id.) When asked when he quit, plaintiff replied "[a]bout three years ago." (Id.) When asked whether he had those hand problems three years ago, plaintiff replied "[y]eah.  They were going numb on me. Yeah." (Id.) He testified that he could use a cell phone but did not text because he could not push a lot of little buttons. (Tr. 54).

Plaintiff testified that his problems had gradually declined over the past three years. (Tr. 55).  He testified that his ability to walk was better about a year and one-half ago, but not his ability to sit longer than 45 minutes or stand longer than 30 minutes. (Id.)

B.  Medical Records[2]

---

[2]Additional evidence which was not before the ALJ was submitted to and considered by the Appeals Council.  This evidence includes medical records from Dr. Beckmann, radiological reports, and a statement from plaintiff.  In the Administrative Transcript, this evidence is designated as Exhibits 21F, 22F, 23F, 24F, and 11E, and found at pages 351-377, and 193-96).  The Court must consider these records in determining whether the ALJ's decision was supported by substantial evidence.  Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994).  For the sake of continuity,

On June 6, 2006, plaintiff saw Terry L. Thrasher, D.O., and it was noted that plaintiff's history was "L leg goes Knumb - [[sic] cold - tingles." (Tr. 212).   An MRI was ordered. (<u>Id.</u>) Later that month, plaintiff underwent sleep studies at Moberly Regional Medical Center, on the referral of Dr. Thrasher. (Tr. 205-10).   The impression was obstructive sleep apnea effectively controlled with a BiPAP. (Tr. 205-11).

On February 28, 2007, plaintiff saw Jon R. Mattson, D.O., with complaints of low back pain after a fall onto concrete on the right side of his body on February 14, 2007. (Tr. 236).  Plaintiff complained of pain radiating down his right leg.  (<u>Id.</u>)  Upon examination, plaintiff had good strength and reflexes, and sensation was okay. (<u>Id.</u>)  The remainder of Dr. Mattson's note is illegible.  <u>See</u> (<u>Id.</u>)  Lumbar spine x-ray performed on March 9, 2007 revealed spondylosis, disk space narrowing, potential spinal stenosis L5-S1, and questionable minimal compression deformity at L1.  (Tr. 234).

X-ray of plaintiff's right hip, performed on March 9, 2007 at Moberly Radiology and Imaging, revealed degenerative changes in each hip joint. (Tr. 199).  X-ray of plaintiff's lumbar spine performed on this same date revealed spondylosis, disk space narrowing. (Tr. 200).

An MRI of plaintiff's lumbar spine, performed on April 17, 2007, revealed disc protrusion at L5-S1 resulting in severe

_____

discussion of these records is incorporated with that of the records before the ALJ at the time of his decision.

right-sided neuroforaminal narrowing and some mild central canal narrowing, and disc dessication and disc space narrowing at L5-S1; mild disc bulges at L3-L4 and L4-L5 without significant stenosis or neuroforaminal narrowing.  (Tr. 203).

On May 7, 2007, plaintiff returned to Dr. Mattson, stating that he needed a refill of Vicodin, and also stating that he wanted his dosage increased.  (Tr. 220).  Dr. Mattson wrote that plaintiff reported that he needed a higher dosage, was waiting to see if he could get assistance for his problem, was in need of surgery because of severe stenosis on his right side.  (Id.)  Upon examination of plaintiff's extremities, Dr. Mattson noted that plaintiff had good pulses, moved his extremities well, had no motor deficits and no swelling.  (Tr. 221).  Upon musculoskeletal examination, Dr. Mattson noted no muscle atrophy, good strength, and moderate lumbar spasm.  (Id.)

Plaintiff returned to Dr. Mattson on July 11, 2007 stating that he had an abscessed tooth and needed antibiotics.  (Tr. 222).  Upon examination, Dr. Mattson noted that plaintiff had a loose and painful molar, diagnosed plaintiff with a tooth abscess, and prescribed an antibiotic.  (Tr. 223).  Dr. Mattson noted that review of plaintiff's musculoskeletal system and extremities was unremarkable, and there are no musculoskeletal complaints noted in Dr. Mattson's treatment note.  (Tr. 222-223).

On August 23, 2007, plaintiff saw Osvaldo Acosta-Rodriguez, M.D., for a Family Services Evaluation.  (Tr. 215-16,

219).  Plaintiff complained of an onset of pain in March of 2007, and complained of occasional and intermittent pain.  (Tr. 215). Plaintiff stated that he sometimes had some pain shooting into the back of his legs, and sometimes not.  (Id.)  He stated that he used ice and heat, and took Vicodin.[3]  (Id.)  Plaintiff reported that he was a painter.  (Id.)  Upon examination, plaintiff was able to move all four extremities, had no obvious gait abnormality, straight leg raise testing was negative, he had a leg length discrepancy, normal deep tendon reflexes, no abnormal sensation, and clicking in the SI joint.  (Tr. 219).  Dr. Acosta-Rodriguez noted symmetrical range of motion, and no radicular complaints.  (Id.)  Plaintiff had no new pain after the examination, and Dr. Acosta-Rodriguez noted that he got up and walked out normally.  (Id.)  Dr. Acosta-Rodriguez's assessment was right SI joint dysfunction, no evidence of radiculopathy, allegations of bulging discs and nerve pinch, and suspect facet DJD and/or neural foraminal stenosis.  (Tr. 216).

In his report, Dr. Acosta-Rodriguez wrote that plaintiff asked "particular questions about going back to work or not" and that plaintiff's "behavior was unusually upbeat for a patient for a county evaluation."  (Id.)  Dr. Acosta-Rodriguez wrote "[a]t the end of the evaluation, he was happy with what I diagnosed him with and he gave me a pen from his business."  (Tr. 219).  Dr. Acosta-Rodriguez wrote that he watched plaintiff walk out to the parking

---

[3]Vicodin is a combination of the drugs Acetaminophen and Hydrocodone, and is used to relieve moderate to moderately severe pain.  http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a601006.html

lot, and that plaintiff appeared to be doing fairly well with no gait abnormality. (Id.) Dr. Acosta-Rodriguez wrote: "I did have some concerns regarding some of his questioning regarding long term complications and pain and disability for such a young male.  I thought it was rather unusual to be focusing on these subjects." (Id.)

Plaintiff returned to Dr. Mattson on August 28, 2007 and stated that his back pain had worsened, and that he had swelling and a knot in his right thigh. (Tr. 224).  Upon examination, Dr. Mattson noted that plaintiff was in no acute distress, had good pulses, moved his extremities well, and had no motor deficits or swelling. (Tr. 225).  Dr. Mattson diagnosed plaintiff with low back pain, herniated disk, and lumbar radiculopathy, and prescribed Vicodin. (Id.)

On September 4, 2007, plaintiff saw Jason D. Zerrer, M.D., with complaints of abdominal pain. (Tr. 278).  Dr. Zerrer's examination revealed negative findings relative to the musculoskeletal system, and noted that examination of plaintiff's back and extremities was within normal limits. (Tr. 279). Plaintiff was in mild distress. (Id.) A CT of plaintiff's abdomen revealed a small kidney stone. (Tr. 286).  Plaintiff's pain improved. (Tr. 280).

Plaintiff returned to Dr. Mattson on November 29, 2007 with complaints of right shoulder and neck pain. (Tr. 228).  Upon examination, plaintiff had good shoulder range of motion, and some biceps tendon pain. (Id.)  X-ray was ordered, which revealed no

evidence of fracture, dislocation or degenerative change, but some evidence of granulomatous changes. (Tr. 226). Plaintiff saw Dr. Mattson on December 6, 2007 with complaints of bicep pain, and Dr. Mattson noted bicep pain upon motion and palpation. (Tr. 227). Dr. Mattson diagnosed biceps tendonitis. (Id.)

Records from Terry L. Thrasher, D.O., indicate that plaintiff was seen for complaints of back pain in January of 2008 and right shoulder pain in February of 2008, and underwent treatment for these complaints through June 30, 2008. (Tr. 237-43). However, as the ALJ noted, these records are largely illegible.

On July 29, 2008, plaintiff was seen by Laurel Sommer, M.D., stating that he wished to establish care. (Tr. 244). Dr. Sommer noted that plaintiff was a painter. (Id.) Plaintiff complained of chronic low back and new onset of right shoulder pain that was reduced to a dull ache with narcotics, but never completely resolved. (Id.) Plaintiff reported that, three months ago, something "popped" in his right shoulder, and he now had limited range of motion. (Id.) He stated that he was out of the narcotics that his primary care physician prescribed, and he wanted refills. (Tr. 244). Upon examination, Dr. Sommer noted that plaintiff was tender over the right SI joint. (Tr. 246). Dr. Sommer wrote that plaintiff's "pain response seemed exaggerated" and that plaintiff kept his eyes closed during the entire musculoskeletal examination. (Id.) Plaintiff had no tenderness to palpation of the vertebrae, no swelling, normal muscle tone, no

- 10 -

tenderness, no tenderness to palpation of the shoulder, intact range of motion bilaterally (although plaintiff indicated that movement was severely painful), and full shoulder strength. (Id.) Straight leg raise testing was negative bilaterally. (Id.) Dr. Sommer again wrote "[p]ain response seemed exaggerated." (Tr. 246). Dr. Sommer's impression was low back pain, right shoulder pain, decreased urinary flow, and elevated blood pressure, and she prescribed medication and recommended MRI. (Id.)

MRI of plaintiff's right shoulder, performed on August 6, 2008, revealed degeneratie change in the AC joint with impingement. (Tr. 249).

On August 12, 2008, plaintiff saw orthopedist Dominic Patillo, M.D., with complaints of right shoulder pain that started in his neck and radiated all the way down into his hand, and was accompanied by a numbness throughout his entire right hand. (Tr. 254-55). Plaintiff stated that the pain was present during rest and activity, but that certain positions caused the pain to wax or wane. (Tr. 255). He denied weakness. (Id.) Examination of plaintiff's cervical spine showed globally mildly reduced range of motion with some mild pain. (Id.) Plaintiff had full range of motion of his right shoulder, full rotator cuff strength, full bicep, tricep and wrist strength, intact sensation, and normal findings in his hand. Cervical spine x-ray performed on August 12, 2008 was interpreted as normal, and cervical MRI showed evidence of some tendinopathy. (Tr. 251, 256). Right shoulder x-ray performed on that date revealed no fracture, dislocation or bony abnormality.

- 11 -

(Tr. 285).  Dr. Patillo's assessment was right shoulder and arm pain.  (Tr. 256).  Dr. Patillo noted that plaintiff's symptoms of pain radiating down his arm and numbness could not be explained by the MRI findings.  (<u>Id.</u>)  Dr. Patillo recommended that plaintiff have his neck reevaluated, and that plaintiff could be seen on an as-needed basis.  (<u>Id.</u>)

On September 2, 2008, plaintiff returned to Dr. Sommer and noted that he had seen an orthopedist, and reported that his "shoulder pain has almost completely resolved" but that he was now having issues with exacerbation of back pain, which he described as sharp right-sided low back pain.  (Tr. 267).  He requested refills of narcotic medication.  (<u>Id.</u>)  Upon examination, plaintiff was tender to palpation of the right SI joint.  (Tr. 268).  Dr. Sommer wrote: "pain response seemed exaggerated - started cursing and grimacing."  (<u>Id.</u>)  She noted that plaintiff indicated reproduction of "burning" pain with palpation.  (<u>Id.</u>)  Plaintiff had normal muscle tone, no swelling, no other tenderness, no edema, normal strength, normal reflexes, and no focal neuro deficits, and straight leg raise testing was negative bilaterally.  (Tr. 268-69).  Dr. Sommer recommended physical therapy, but plaintiff claimed that such treatment would be cost-prohibitive and indicated he wanted an MRI and surgery.  (Tr. 269).  Dr. Sommer gave plaintiff a handout on low back exercises and stated that she would refill his Vicodin prescription while awaiting records from his previous physicians.  (<u>Id.</u>)  Dr. Sommer noted that she requested a urine drug screen from plaintiff, but he was unable to provide a sample.  (<u>Id.</u>)

Lumbar spine MRI performed on September 22, 2008 revealed diffuse disc bulge with central disc protrusion at L5-S1, and mild stenosis of bilateral neural foramina.  (Tr. 262-65).

On January 24, 2009, Cara Falter, a Single Decision-Maker, completed a Physical Residual Functional Capacity form.  (Tr. 291-96).  Ms. Falter opined that plaintiff could occasionally lift and/or carry ten pounds, and frequently lift and/or carry less than ten.  (Tr. 292).  She opined that plaintiff could stand and/or walk for at least two hours in an eight-hour work day, and could sit for six.  (Id.)  She opined that plaintiff's ability to push and/or pull was limited in the upper extremities.  (Id.)  Ms. Falter opined that plaintiff could frequently balance and occasionally perform all other postural maneuvers.  (Tr. 293-94).  She opined that plaintiff's ability to reach in all directions was limited, but that plaintiff had no other manipulative limitations.  (Tr. 294).  She opined that plaintiff should avoid concentrated exposure to vibration and hazards, but had no other environmental limitations.  (Tr. 295).

On February 24, 2009, plaintiff saw Joseph A. Beckmann, M.D. with complaints of back and shoulder pain, and to establish care.  (Tr. 313).  Dr. Beckmann noted that plaintiff had recently established care with Dr. Sommers, and was "establishing it with me today for reasons that are not clear."  (Id.)  Dr. Beckmann noted that pain was plaintiff's main concern.  (Id.)  Dr. Beckmann reviewed plaintiff's chart and noted that the September 22, 2008 lumbar spine MRI showed L5-S1 disk herniation with mild stenosis,

- 13 -

but "was otherwise pretty unremarkable." (Id.) Plaintiff reported
that a pain specialist had recently performed an injection, but
that plaintiff was afraid of needles and would not undergo that
again. (Tr. 313). Plaintiff reported that he had pain in his
right shoulder, and told Dr. Beckmann that he was "a painter by
trade and has pain with any type of movement of the shoulder and
this is precluded [[sic] his ability to work on a regular basis."
(Id.) Dr. Beckmann noted the site of plaintiff's complaints, and
noted that radiological testing of plaintiff's right shoulder and
neck yielded normal findings, and that it was opined that the MRI
did not explain plaintiff's symptoms. (Id.) Dr. Beckmann noted
that, when plaintiff last saw Dr. Sommers, he reported that his
shoulder pain had resolved, but that he wanted narcotics for his
back pain. (Tr. 313-14). Plaintiff reported chronic anxiety.
(Tr. 314). Under "Social History," Dr. Beckmann wrote that
plaintiff "is married and is an employed painter." (Id.) Upon
examination, Dr. Beckmann noted that, as plaintiff described his
pain, "he moved both shoulders through a full, wide arc
demonstrating no deficits in range of motion." (Tr. 315). On
specific testing of the right shoulder, Dr. Beckmann could not
elicit motor weakness in any of the rotator cuff groups, and there
was no joint swelling or redness. (Id.) Upon examination of
plaintiff's back, plaintiff's gait appeared normal and he was able
to rise from a chair and climb onto the examination table with
apparent ease. (Id.) Plaintiff could forward bend to 60 degrees
before stopping due to pain. (Id.) Palpation over the spine

- 14 -

revealed tenderness in the paraspinous muscle groups bilaterally in the lumbosacral region. (Tr. 315). Plaintiff could raise on his toes and rock on his heels, toe extension was normal, and quadriceps strength was good. (Id.)

Dr. Beckmann's assessment was chronic low back pain "as a manifestation of obesity and sedentary lifestyle," right shoulder pain without any evidence of deficit, morbid obesity, and history of bladder outlet obstruction that had responded to medication. (Id.) Dr. Beckmann advised plaintiff to follow a regimen of diet and exercise for weight loss and physical conditioning, and told plaintiff that he would not prescribe narcotics. (Id.) Dr. Beckmann wrote that both plaintiff and his wife appeared upset but made no comment. (Tr. 315).

On August 11, 2009, plaintiff returned to Dr. Beckmann "with a stated concern of high blood pressure but then says that his real concern is irritability," which plaintiff said was getting worse and affecting his marriage and other relationships. (Tr. 317). Plaintiff reported a history of sleep apnea and reported having used a CPAP machine, but stated that the mask broke six months ago and he did not have the money for a replacement. (Id.) Dr. Beckmann's assessment was irritability as a manifestation of bipolar disorder. (Tr. 319). He recommended that plaintiff see a psychiatrist but plaintiff declined, stating "I'm not crazy." (Id.) Dr. Beckmann recommended that plaintiff return in one week. (Id.) Plaintiff returned on August 25 and reported very significant improvement, which his wife confirmed. (Tr. 320). Dr.

Beckmann wrote: "[h]e is much calmer and is functioning well in the work environment, which is something new." (Id.) Plaintiff expressed concern about infertility and an interest in fertility evaluation. (Id.)

On September 11, 2009, plaintiff saw Peter J. Koopman, M.D. with complaints that, following examination, yielded a diagnosis of a bleeding hemorrhoid. (Tr. 322-23).

On September 29, 2009, plaintiff saw Dr. Burkett with complaints related to sleep apnea, stating that he had used a CPAP machine which had helped him until it broke six months ago, and that, since then, he had typical symptoms of sleep apnea. (Tr. 324). Plaintiff reported that the medication he had been taking for bipolar disorder "helps him remain functional both at work and in his home life." (Id.) Dr. Burkett also noted that fertility testing had revealed markedly abnormal results. (Id.) Plaintiff had no musculoskeletal complaints. See (Tr. 324-25). Dr. Burkett noted that he would request plaintiff's sleep study report and review plaintiff's CPAP settings, and prescribe another unit for plaintiff. (Tr. 326).

On October 7, 2009, plaintiff saw Dr. Beckmann with complaints of severe diarrhea. (Tr. 327). Plaintiff reported that he recently got a new CPAP machine and was now sleeping 12 hours per night and that, with this and the psychiatric medication, his mood was much improved. (Id.) Musculoskeletal examination revealed a normal gait. (Tr. 329). Plaintiff was diagnosed with diarrhea that was likely related to an antibiotic. (Id.)

On October 12, 2009, plaintiff saw Melinda Hecker, M.D.,[4] with complaints of persistent diarrhea and abdominal cramping. (Tr. 330).  Plaintiff reported that he "[h]as actually had to almost stay home from work from the cramping and pain of this." (Id.)  Plaintiff did not report any musculoskeletal complaints. See (Tr. 330-31).  Upon examination, plaintiff was most tender in the left lower quadrant, but examination was otherwise unremarkable.  (Id.)  Dr. Hecker recommended stool studies.  (Tr. 331).

On October 19, 2009, plaintiff saw Dr. Beckmann with a complaint of persistent diarrhea.  (Tr. 332).  Plaintiff reported that he had "quite a bit of abdominal cramping along with multiple episodes of fecal incontinence" that had been "bad enough that it has prevented him from working."  (Id.)  Dr. Beckmann noted plaintiff's history of treatment with Dr. Hecker, and noted that stool studies were negative.  (Id.)  Under "Social History" Dr. Beckmann noted that plaintiff was married and self-employed.  (Tr. 333).  Upon musculoskeletal examination, Dr. Beckmann noted that plaintiff had no joint pain, no joint swelling, and no morning stiffness, and joint survey showed no evidence of active synovitis. (Tr. 333-34).  Dr. Beckmann recommended a colonoscopy.  (Tr. 334).

On November 4, 2009, plaintiff returned to Dr. Beckmann and reported lumbosacral pain with no radiation following a fall. (Tr. 335).  Plaintiff denied using any home remedies, ice, or heat,

---

[4]Dr. Hecker and Dr. Beckmann are partners in the same medical practice.

and reported that he was able to walk "although it is quite painful and he can't work." (Id.)  Upon examination, Dr. Beckmann noted that joint survey showed no active synovitis and no external bruising in the lumbosacral area.  (Tr. 336).  Plaintiff could forward bend to 45 degrees before stopping due to pain, lateral and lateral bending and rotary movements were severely restricted, and he could raise on his toes and rock on his heels.  (Id.)  Upon neurologic examination, sensorium was clear, there was no gross motor deficit, and reflexes were normal and symmetrical.  (Id.)  Dr. Beckmann diagnosed plaintiff with a low back contusion and strain and prescribed Vicodin.  (Id.)

On November 13, 2009, plaintiff underwent radiological testing of his abdomen and chest at Moberly Regional Medical Center, which revealed no bowel obstruction, granulomatous changes in the lungs, kidney stones, and no acute abdominal process.  (Tr. 308-10).

Plaintiff returned to Dr. Beckmann on November 24, 2009 and reported severe low back pain.  (Tr. 338).  Dr. Beckmann noted that he first saw plaintiff for this three weeks ago, and then wrote: "[t]oday, he tells me that this pain actually started about 5 years ago when he was crushed in a car door of a slowly moving vehicle" and that plaintiff's "problem is that he can't work like this.  The only thing he is trained to do is construction type work and he is inquiring about his eligibility for disability." (Id.)  Plaintiff also reported right shoulder pain and irritability.  (Tr. 338-39).  He continued to refuse to see a psychiatrist.  (Tr. 339).

Musculoskeletal examination revealed no evidence of synovitis, plaintiff rose from a chair and climbed onto the examination table with "obvious, significant discomfort," he was limited in forward bending, his gait was antalgic, and muscle spasm was present. (Id.)  He could still raise on his toes, and reflexes were maintained.  (Id.)  Dr. Beckmann assessed chronic low back pain related to degenerative joint disease, and opined that plaintiff's back could improve with regular exercise and significant weight loss "but I think his underlying psychiatric problem will preclude any reasonable expectation of that.  I do support his application for disability."  (Id.)

On December 17, 2009, Dr. Beckmann completed an interrogatory form indicating that he had been treating plaintiff since August 11, 2009 for bipolar disorder, lumbar spondylosis with chronic back pain, obstructive sleep apnea, gastroesophageal reflux, chronic diarrhea, and bladder outlet obstruction.  (Tr. 297).  In response to the interrogatory question "[i]f Mr. Burkett has lower back pain would it be recommended that he lay down to relieve that pain" Dr. Beckmann wrote "yes."  (Id.)

On January 15, 2010, plaintiff saw Dr. Beckmann for follow up.  (Tr. 341).[5]  Dr. Beckmann wrote: "[w]ith regard to concerns about bipolar disorder, both he and his wife indicates that things are pretty well controlled."  (Id.)  It is noted that

---

[5]While this treatment note lists a "[r]esult date" of February 15, 2010, the date of service was January 15, 2010. (Tr. 341).  In his decision, the ALJ correctly noted the date of service as January 15, 2010.  (Tr. 25).

plaintiff's mood was "pretty stable" although he easily became excited about trivial things, and he was sleeping fine. (Id.) Plaintiff reported that he continued to be bothered by back pain, and told Dr. Beckmann that he spent most of the day lying in bed or on the couch because of this. (Id.) He reported that he had a disability hearing scheduled soon. (Tr. 341). He reported no change in the quality or character of his symptoms, and denied lower extremity numbness or weakness. (Id.) Plaintiff reported that his problems with diarrhea had resolved. (Id.) Plaintiff reported that he had gained quite a bit of weight recently, and attributed this to being more sedentary due to back pain and increased appetite due to steroids. (Id.) Dr. Beckmann's assessment included "presumed bipolar disorder, stable" with the note that plaintiff "still declined psychiatric consultation," and chronic low back pain, stable. (Tr. 342).

Records from Audrain Medical Center indicate that plaintiff was seen by Daniel Jost, M.D. on April 8, 2010. Dr. Jost noted that plaintiff was a "poor historian" with "rich musculoskeletal complaints." (Tr. 344). Plaintiff reported neck and back pain, and stated that he had a bulging disc and injections in his back, and also had shoulder pain for which injections were recommended. (Id.) Plaintiff complained of pain and swelling in his hands, wrists, shoulders, elbows, knees, ankles and feet associated with four hours of morning stiffness. (Id.) Plaintiff rated his pain as a seven on a one-to-ten scale, and reported that he was unable to dress himself including shoe laces and buttons.

- 20 -

(Id.)  He reported difficulty getting out of bed, walking, washing, bending, getting out of a car, and stated that he could not walk two miles.  (Id.)  He reported that he was not presently working. (Tr. 345).  Plaintiff denied worries, but complained of anxiety, temper, depression, agitation, and trouble staying asleep.  (Tr. 346).  Plaintiff had diffuse tenderness in the joints of his fingers and hands, full passive range of motion at the shoulder but limitation to 90 degrees with active range of motion.  (Id.) Rolling the hips caused back pain, and his knees were slightly tender.  (Id.)  His ankles were "exquisitely tender" and his metacarpophalangeal joints were tender.  (Id.)  Dr. Jost's impression was diffuse polyarthralgias, and he recommended tests for autoimmune diseases including rheumatoid arthritis, and x-rays of the hands, wrists and feet.  (Tr. 347).

Plaintiff returned to Dr. Jost on April 15, 2010 and reported some improvement in his hand symptoms with steroid medication, but stated that his shoulders bothered him the most. (Tr. 348).[6]  Plaintiff reported that his right shoulder pain had increased and that he had excruciating pain in his left shoulder. (Id.)  Plaintiff reported that he still had some discomfort in his lumbar spine as well.  (Id.)  Dr. Jost noted that the September 2008 lumbar spine MRI revealed mild stenosis at L5-S1, and the August 2008 right shoulder MRI showed degenerative change with

---

[6]This visit occurred after the April 9, 2010 administrative hearing, but the record of this visit was not submitted to the Appeals Council.

impingement and possibly a partial tear of the supraspinatus tendon. (Id.) Upon examination, plaintiff was tender in his hands, but his wrists and elbows were unremarkable, he had limited abduction of his left shoulder, and his hips and knees were unremarkable. (Id.) Dr. Jost wrote that plaintiff may have mild rheumatoid arthritis and a rotator cuff tear, and ordered an MRI.

The following medical records were submitted to the Appeals Council. On May 20, 2010, plaintiff saw Dr. Beckmann and reported increased symptoms of agitation and irritability after stopping his psychiatric medication. (Tr. 351). Plaintiff reported that he had some lower extremity edema at the end of the day. (Id.) Plaintiff reported having been diagnosed with rheumatoid arthritis, and stated that he was taking medication and "his symptoms are much improved." (Id.) Plaintiff had no musculoskeletal complaints. Upon examination, Dr. Beckmann noted no lower extremity edema. (Tr. 352). Dr. Beckmann's assessment was bipolar disorder, hypertension, chronic abdominal pain and diarrhea, and a new diagnosis of rheumatoid arthritis. (Id.) Plaintiff returned to Dr. Beckmann on June 14, 2010 with complaints of chest congestion and productive cough. (Tr. 354). He denied lower extremity edema. (Id.) He had no musculoskeletal complaints. He was diagnosed with bronchitis. (Tr. 355).

Plaintiff returned to Dr. Beckmann on July 26, 2010 and reported that "[t]wo days ago he was fixing some gutters on his home" when a "metal gutter came away from the house and contacted an electrical power line as it left the transformer" and plaintiff

"was standing on a ladder at that time but did not fall" but was unable to let go of the ladder for a brief period. (Tr. 356). Plaintiff reported spending the past 48 hours in bed and continued to have a lot of aching in his arms and shoulders and pain in his right thigh. (Id.) Musculoskeletal examination revealed no joint swelling or morning stiffness but some muscle aching as described, no active synovitis, tenderness over the right quadriceps muscle group but no redness or warmth, and muscle mass was symmetrical. (Tr. 357-58). "Examination of the cervical spine revealed a good, full range of motion with no pain or limitations." (Tr. 358). Motor exam showed normal bulk and tone throughout, and strength was full bilaterally. (Id.) Gait and station were normal. (Id.) The assessment was electrocution, and tests were ordered. (Id.)

Plaintiff returned to Dr. Beckmann on August 19, 2010 and reported he had fully recovered from the electric shock and that his weight was his primary concern, and he was interested in bariatric surgery. (Tr. 360-61). He reported that he had a CPAP machine but found it difficult to use and therefore did not consistently use it. (Tr. 361). He was given contact information for a bariatric surgery program. (Tr. 362). Plaintiff returned on September 13, 2010 with concerns about right hand pain, but that his primary concern was his progressive weight gain. (Tr. 363). Dr. Beckmann noted that, although plaintiff expressed interest in bariatric surgery, he did not present for the blood work that he and Dr. Beckmann had planned last month. (Id.) Plaintiff denied lower extremity edema. (Id.) Musculoskeletal examination revealed

- 23 -

some puffiness around the right wrist and MCP joints.  (Tr. 364).

Dr. Beckmann saw plaintiff again in September for upper respiratory

symptoms.

MRI of plaintiff's lumbar spine performed on February 8,

2011 revealed an apparent central herniated disk at L5-S1 that did

not lateralize, no spinal stenosis, and foraminal narrowing at L5-

S1, greater on the right.  (Tr. 374-75).

X-ray of plaintiff's right foot, performed on February

22, 2011, revealed a small plantar calcaneal spur and posterior

enthesophyte related to degenerative changes, and maintained joint

spaces.  (Tr. 376).

On March 2, 2011, plaintiff's attorney sent a letter and

Medical Source Statement (also "MSS") from Dr. Beckmann to the

Appeals Council.  In the letter, plaintiff's attorney wrote that

the ALJ had disregarded Dr. Beckmann's opinion due to the lack of

specific functional limitations, which the MSS included.  (Tr.

370).  In the MSS, dated February 14, 2011, Dr. Beckmann indicated

that plaintiff could only occasionally lift five pounds, could

stand and/or walk continuously for 10 minutes, was limited in his

ability to push and/or pull, could never climb, balance or stoop,

could occasionally kneel, crouch and bend, and was limited in his

ability to reach.  (Tr. 371-72).  Dr. Beckmann opined that

plaintiff was unlimited in all other areas and had no environmental

restrictions.  (Tr. 372).  Dr. Beckmann left blank the sections of

the form that asked him to describe the ways in which the impaired

activities were limited, and to describe the principal clinical and

- 24 -

laboratory findings and symptoms or allegations (including pain) from which plaintiff's impairment-related limitations were concluded. (Tr. 372-73). Dr. Beckmann checked boxes indicating that had considered pain, discomfort, and/or other subjective complaints, and that rest would be helpful to plaintiff. (Tr. 373). Dr. Beckmann checked boxes indicating that he did not consider it necessary for plaintiff to assume a reclining or supine position, or prop up his legs, to help control existing pain or fatigue. (Id.)

### III.    The ALJ's Decision

The ALJ determined that plaintiff had the severe impairments of lumbar spondylosis with chronic back pain, stable; right shoulder degenerative joint disease with impingement; mild rheumatoid arthritis; hypertension; obesity, and obstructive sleep apnea, (Tr. 19), but did not have an impairment or combination of impairments of listing-level severity. (Tr. 28). The ALJ conducted an exhaustive analysis of the medical evidence of record and concluded that plaintiff retained the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.927(a) except that plaintiff was able to sit for only about 30 minutes at any one time before having to stand at the workplace for less than five minutes. (Tr. 29). The ALJ further determined that plaintiff was limited to only occasional stooping, balancing and climbing of ramps and stairs, and should never kneel, crouch, crawl, or climb ropes, ladders, or scaffolds. (Id.) The ALJ further determined that plaintiff should perform no

- 25 -

overhead work and should avoid exposure to vibration and to workplace hazards such as dangerous machinery or unprotected heights, but was able to frequently but not constantly use his right upper extremity for reaching, grasping, handling or fingering. (Id.)

Citing SSR 02-1P, the ALJ noted that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately. (Tr. 31). The ALJ then wrote that he had considered the effects of plaintiff's obesity in determining RFC. (Id.)

The ALJ determined that plaintiff was unable to perform his past relevant work. (Tr. 31). The ALJ considered plaintiff's residual functional capacity, age, education and work experience in conjunction with the Medical-Vocational Guidelines, and also considered vocational expert testimony regarding the extent to which plaintiff's additional limitations eroded the unskilled sedentary occupational base. (Tr. 32). Based thereon, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that plaintiff could perform. (Id.) The ALJ concluded that plaintiff was not under a disability, as defined in the Act, at any time through the date of the decision. (Tr. 33).

## IV.   Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act (also "Act"), plaintiff must prove that he is disabled.

Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether the claimant's impairment(s) meet or equal any listed in 20 C.F.R., Subpart P, Appendix 1. If

claimant's impairment(s) is equivalent to a listed impairment, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  The "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).

If substantial evidence exists to support the administrative decision, this Court must affirm that decision even if the record also supports an opposite decision.  Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation

- 28 -

marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003); see also Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000) (In the event that two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole).

In the case at bar, plaintiff claims that the ALJ's RFC determination is not based upon substantial evidence.  In support, plaintiff argues that the ALJ's rationale for disregarding evidence from Dr. Beckman and adopting the opinion of Dr. Acosta-Rodriguez has no basis in the record.  Plaintiff also challenges the ALJ's observation regarding the timing of Dr. Beckmann's December 17, 2009 interrogatory responses in relation to his subsequent examination of plaintiff.  Plaintiff also argues that Dr. Beckmann's MSS, generated after the ALJ's decision and submitted to the Appeals Council, addresses the issues the ALJ gave for disregarding Dr. Beckmann's earlier evidence.  Plaintiff also states that the Appeals Council must consider evidence that is new, material, and relates to the period on or before the ALJ's decision.  Plaintiff also contends that the ALJ did not discuss the impact of obesity upon plaintiff's other medical problems in accordance with SSR 02-1P.  In response, the Commissioner contends that substantial evidence supports the ALJ's decision.

B.   RFC Assessment

Plaintiff challenges this assessment for the reasons described above.  Review of the ALJ's RFC determination reveals no

error.

Residual functional capacity is defined as that which a person remains able to do despite his limitations.  20 C.F.R. §§ 404.1545, 416.945, <u>Lauer v. Apfel</u>, 245 F.3d 700, 703 (8th Cir. 2001).  The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations.  20 C.F.R. § 404.1545; <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995); <u>Goff</u>, 421 F.3d at 793.

A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination.  <u>Id.</u>; <u>Hutsell v. Massanari</u>, 259 F.3d 707, 711-12 (8th Cir. 2001); <u>Lauer</u>, 245 F.3d at 703-04; <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000).  Although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance.  <u>Pearsall</u>, 274 F.3d at 1217 (8th Cir. 2001); <u>McKinney</u>, 228 F.3d at 863.

While an that an ALJ's RFC determination must be supported by some medical evidence, "the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." <u>Vossen v. Astrue</u>, 612 F.3d 1011, 1016 (8th Cir. 2010).  Plaintiff cannot meet this burden on his statements alone.  There must be medical signs and laboratory findings showing an impairment which

could reasonably be expected to produce the symptoms alleged and which, when considered with all of the other evidence, would lead to the conclusion that the claimant is disabled.  20 C.F.R. §§ 404.1529, 416.929.

While plaintiff challenges the ALJ's RFC determination, he does not set forth any argument specifically challenging the ALJ's credibility determination.  Because the ALJ must first evaluate a claimant's credibility before determining his RFC, Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005), the undersigned conducted a full analysis of the ALJ's credibility determination and concludes that it is supported by substantial evidence on the record as a whole.

In his decision, the ALJ wrote that he had considered all symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929, and SSRs 96-4p and 96-7p.  The ALJ then noted several inconsistencies in the record that detracted from the credibility of plaintiff's subjective complaints.  For example, the ALJ noted evidence in the record that plaintiff was working in September and October of 2009.  There is also evidence in the record that plaintiff was employed in February of 2009.  Evidence that plaintiff was working during a period he alleged total disability is inconsistent with a finding of disability and with his allegations of symptoms precluding all work.  Dunahoo v. Apfel, 241 F.3d 1033, 1038-39 (8th Cir. 2001) (seeking work and working at a

job while applying for benefits are activities inconsistent with complaints of disabling pain); Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996) (claimant's work activities during claimed disability period held inconsistent with subjective complaints). The evidence that plaintiff was performing some type of work is also directly inconsistent with his hearing testimony. As quoted above, the ALJ repeatedly asked plaintiff about his work activity since April 2, 2007, and plaintiff repeatedly denied performing any and all work since that date. The ALJ was entitled to consider evidence of plaintiff's dishonesty as detracting from his credibility. See Simmons v. Massanari, 264 F.3d 751, 756 (8th Cir. 2001) (the ALJ's adverse credibility determination was supported by evidence that the claimant had given inconsistent statements, including lying about his age to enter military service); Ply v. Massanari, 251 F.3d 777, 779 (8th Cir. 2001) (an ALJ is entitled to consider a claimant's inconsistent statements in determining his credibility).

Similarly, the ALJ noted that Dr. Sommer observed, on more than one occasion, that plaintiff's pain response seemed exaggerated. The ALJ was entitled to consider this evidence as detracting from plaintiff's credibility. See Jones v. Callahan, 122 F.3d 1148, 1152 (8th Cir. 1997) (noting that ALJ may consider evidence that a claimant has exaggerated his or her symptoms when evaluating claimant's subjective complaints).

The ALJ also noted Dr. Patillo's observation that plaintiff's symptoms could not be explained by MRI findings. The

ALJ's observation is supported by the record, and is consistent with the balance of the medical information of record, which the ALJ exhaustively discussed in his decision.   As the foregoing summary of this medical information indicates, objective testing documented largely mild results or results that did not account for plaintiff's symptoms, and examination revealed mostly normal or mild findings.   While the lack of objective medical evidence is not dispositive, it is an important factor, and the ALJ is entitled to consider the fact that there is no objective medical evidence to support the degree of alleged limitations.   20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); Kisling v. Chater, 105 F.3d 1255, 1257-58 (8th Cir. 1997); Cruse v. Bowen, 867 F.2d 1183, 1186 (8th Cir. 1989) (the lack of objective medical evidence to support the degree of severity of alleged pain is a factor to be considered); see also Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006) (ALJ properly discredited the plaintiff's testimony regarding self-limitation of physical activities when such limitations were inconsistent with the medical records).

The ALJ also noted that, when plaintiff saw Dr. Jost on April 8, 2010, his present medication list included no prescription pain medication.   The lack of prescription medication is inconsistent with allegations of disabling impairments.   Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999).

Of some additional note is the fact that, when seeking medical treatment for other conditions, plaintiff did not consistently complain of the same severe musculoskeletal pain he

described during the hearing. Stephens v. Shalala, 46 F.3d 37, 38 (8th Cir. 1995) (per curiam) (discrediting later allegations of back pain when no complaints made about such pain while receiving other treatment). The undersigned also notes that Dr. Acosta-Rodriguez observed, on August 23, 2007, that plaintiff asked "particular questions about going back to work or not," that his "behavior was unusually upbeat for a patient for a county evaluation," that Dr. Acosta-Rodriguez had "some concerns regarding some of his questioning regarding long term complications and pain and disability for such a young male" and "thought it was rather unusual to be focusing on these subjects." (Tr. 219). A claimant's apparent motivation to qualify for benefits can contribute to an adverse credibility determination when, as here, other factors cast doubt upon the claimant's credibility. Ramirez v. Barnhart, 292 F.3d 576, 581 n. 4 (8th Cir. 2002).

Where adequately explained and supported, credibility findings are for the ALJ to make. See Tang v. Apfel, 205 F.3d 1084, 1087 (8th Cir. 2000). The undersigned has carefully reviewed the record, and believes that the ALJ's finding that plaintiff's subjective complaints were not fully credible was adequately explained, and was supported by substantial evidence on the record as a whole. See Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003) (ALJ properly discredited claimant's allegations of disabling impairments based upon numerous inconsistencies in the record; including the lack of objective medical evidence, and evidence that claimant gave different accounts at different times).

- 34 -

Challenging the ALJ's RFC assessment, plaintiff argues that there is no basis in the record for ALJ's decision to disregard evidence from Dr. Beckmann.  Review of the ALJ's decision reveals no error.

A treating physician's opinion is generally entitled to substantial weight, but it does not automatically control, because the ALJ must evaluate the record as a whole.  Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) (citing Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004)). When an ALJ discounts a treating physician's opinion, he should give "good reasons" for doing so. Davidson, 501 F.3d at 990 (citing Dolph v. Barnhart, 308 F.3d 876, 878 (8th Cir. 2002).  According to the Regulations and to Eighth Circuit precedent, a treating physician's opinion must be well-supported by medically acceptable clinical and laboratory diagnostic techniques to be entitled to controlling or substantial weight.  20 C.F.R. §§ 404.1527(d)(3), 414.927(d)(3); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). If justified by substantial evidence in the record as a whole, the ALJ can discount the opinion of an examining physician or a treating physician.  See Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986).

As the ALJ observed, on November 24, 2009, Dr. Beckmann wrote that he "support[ed] [plaintiff's] application for disability." (Tr. 339).  On December 17, 2009, in response to interrogatories, Dr. Beckmann listed plaintiff's diagnoses and, in response to a question whether plaintiff should lay down if he

experienced back pain, wrote "yes." (Tr. 297). The ALJ wrote that Dr. Beckmann's opinions were entitled to little weight because they were not well-supported by medically acceptable clinical and laboratory diagnostic techniques, and they were inconsistent with and unsupported by the medical evidence of record, including Dr. Beckmann's own treatment notes. The ALJ properly considered Dr. Beckmann's opinions.

Dr. Beckmann's opinion evidence fails to document any medically acceptable clinical and laboratory diagnostic techniques that would tend to support the opinions he offered. His opinions were therefore not entitled to controlling or substantial weight. 20 C.F.R. §§ 404.1527(d)(3), 414.927(d)(3); Reed, 399 F.3d at 920. Given the absence of objective medical evidence and, as discussed supra, the fact that Dr. Beckmann's treatment notes most often documented essentially normal examination results, it seems most likely that his opinions were largely based upon plaintiff's subjective complaints. An ALJ may discount an opinion that is based largely on a claimant's subjective complaints rather than objective medical evidence. Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007); Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005) (an ALJ was justified in giving less weight to a treating physician's opinion where the physician failed to document objective medical evidence to support subjective complaints); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (affirming ALJ's assessment of treating physician's opinion as unsupported by objective medical tests or diagnostic data and not

conclusive in disability determination; the weight given to even a treating physician's opinion is limited if it is only a conclusory statement).

In addition, Dr. Beckmann's opinion evidence is inconsistent with the medical evidence in the record as a whole. Multiple physical examinations, including Dr. Beckmann's, contained very little in the way of objective findings of musculoskeletal abnormalities, and most consistently documented that plaintiff had normal range of motion, normal strength, normal reflexes, normal gait, no edema, no joint stiffness, no muscle atrophy or spasm, no other neurologic or motor deficits, and negative straight leg raise testing. (Tr. 219, 222-25, 228, 246, 255, 268-69, 278-79, 318, 325, 329, 328-31, 333-34, 342, 352, 358). See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight").

Dr. Beckmann's opinion evidence is also inconsistent with his own treatment records. As noted above, Dr. Beckmann repeatedly documented little to no musculoskeletal findings upon examination. In addition, as the ALJ observed, Dr. Beckmann's January 15, 2010 treatment note (dated one month after Dr. Beckmann's interrogatory responses) was inconsistent with the opinion evidence. In that treatment note, despite plaintiff's complaints of back pain so severe that he spent most of the day in bed, Dr. Beckmann's examination of plaintiff yielded nothing in the way of objective findings, and he diagnosed plaintiff simply with "chronic low back

pain, stable." (Tr. 27, 342). Plaintiff contends that this treatment note supports Dr. Beckmann's opinion evidence inasmuch as Dr. Beckmann observed that plaintiff was lying in bed all day due to back pain. However, Dr. Beckmann was not stating his opinion that plaintiff's condition required him to lay in bed all day. Instead, Dr. Beckmann was merely documenting plaintiff's subjective complaints. Dr. Beckmann's January 15, 2010 treatment note contains nothing in the way of objective findings to support the conclusion that plaintiff's condition rendered him bedridden. See Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006) (statements regarding self-limitation of physical activity are properly discredited when they are inconsistent with treatment records). In addition, in an earlier treatment note, Dr. Beckmann observed that plaintiff, while describing his debilitating shoulder pain, "moved both shoulders through a full, wide arc demonstrating no deficits in range of motion." (Tr. 315). When a treating physician's treatment notes are inconsistent with his opinion evidence, the Commissioner will decline to give controlling weight to the residual functional capacity assessment. See Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006); Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's own clinical treatment notes").

Plaintiff takes great issue with the ALJ's statements surrounding Dr. Beckmann's December 17, 2009 interrogatory responses and Dr. Beckmann's findings when he next saw plaintiff.

- 38 -

In the context of noting inconsistencies between Dr. Beckmann's opinion evidence and his treatment records, the ALJ observed that Dr. Beckmann's December 17, 2009 interrogatory responses were dated just one month before his examination of plaintiff yielded nothing in the way of objective clinical findings. (Tr. 28). In making this observation on page 28 of the administrative transcript, the ALJ mistakenly listed the date of that subsequent examination as December 15, 2009, which is actually two days before the date of the interrogatories. Plaintiff strenuously argues that the ALJ's statement makes no sense and, characterizing the subsequent treatment note as dated February 15, 2010, argues that the ALJ erroneously considered it as dated one month after the interrogatory responses. (Docket No. 18 at 21-23). Review of the ALJ's decision reveals no error.

Earlier in his decision, the ALJ observed the proper date of the subsequent treatment note as "January 15, 2010 (date of service)," one month after Dr. Beckmann's interrogatory responses. (Tr. 25).[7] The ALJ's later observation that the treatment note was dated two days before the interrogatory responses is obviously a typographical error, in that the ALJ first correctly listed the date of the subsequent treatment note, correctly observed the date of the interrogatory responses, and correctly observed that Dr. Beckmann saw plaintiff one month after completing the interrogatory

---

[7]As noted above, while the "[r]esult date" of the treatment note is indeed February 15, 2010, the date of service is clearly listed as January 15, 2010. (Tr. 341).

responses.  See Quaite v. Barnhart, 312 F. Supp. 2d 1195, 1199-1200 (E.D. Mo. 2004) (whether misstatement is typographical error is to be determined by reading misstatement in context of entire opinion).  There is no error in the ALJ's findings concerning the timing of Dr. Beckmann's interrogatory responses in relation to his subsequent treatment note.

Plaintiff also contends that Dr. Beckmann's February 14, 2011 MSS, generated nearly six months after the ALJ's decision and submitted to the Appeals Council, supports his applications and corrects the deficiencies that the ALJ cited in discrediting Dr. Beckmann's other opinion evidence.  Plaintiff's arguments are meritless.

Judicial review under 42 U.S.C. § 405(g) is confined to the evidence before the Commissioner at the time of his decision. 42 U.S.C. § 405(g).  While additional evidence may in limited circumstances form the basis for remand, a claimant must show that the new evidence is material, and that there was good cause for the failure to incorporate that evidence into the record before the Commissioner.  Mouser v. Astrue, 545 F.3d 634, 63637 (8th Cir. 2008) (quoting 42 U.S.C. § 405(g)).  To be material, new evidence must be non-cumulative, relevant, and probative of a claimant's condition during the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the Commissioner's determination.  Kroqmeier v. Barnhart, 294 F.3d 1019, 1025 (8th Cir. 2002).  "Where, as here, the Appeals Council considers new evidence but denies review, [the reviewing

court] must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." <u>Davidson v. Astrue</u>, 501 F.3d 987, 900 (8th Cir. 2007).

In his brief, plaintiff focuses upon Dr. Beckmann's MSS. However, the MSS satisfies none of the foregoing requirements, and in no way undermines the ALJ's decision.  There is no evidence that Dr. Beckmann's MSS is probative of plaintiff's condition during the relevant time period, and plaintiff does not demonstrate good cause for failing to incorporate the MSS into the record earlier.  The MSS is dated February 14, 2011, and contains nothing to indicate that it describes plaintiff's condition during the time period for which benefits were denied.  The MSS does not remedy any of the deficiencies the ALJ observed when discounting Dr. Beckmann's opinion evidence, and there is no reasonable likelihood that the MSS would have changed the ALJ's decision.  In the MSS, Dr. Beckmann included no clinical or laboratory findings to support the assessed restrictions, despite the fact that the MSS form included a separate question specifically soliciting this information.  <u>See</u> (Tr. 373).  Had the ALJ reviewed the MSS, he would most likely have treated it in the same manner as Dr. Beckmann's other opinion evidence.  None of the evidence submitted to the Appeals Council, including the MSS, undermine the ALJ's well-reasoned RFC determination.

Plaintiff also states, in conclusory fashion, that the ALJ erred by giving weight to Dr. Acosta-Rodriguez's opinion that plaintiff's impairment might preclude some types of work, but not

all.  Review of the ALJ's decision reveals no error.  As the Commissioner correctly argues, Dr. Acosta-Rodriguez formed his opinion after examining plaintiff and reviewing his medical history.  See 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1) (opinions of examining sources are generally given more weight).  Unlike Dr. Beckmann's opinions, Dr. Acosta-Rodriguez's opinion is consistent with and supported by the balance of the evidence in the record as a whole.  See 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4) (opinions that are consistent with the record as a whole will generally be given more weight).  Finally, the ALJ did not rely exclusively on Dr. Acosta-Rodriguez's opinion, but instead formulated plaintiff's RFC after fully considering and properly weighing all of the medical and other evidence in the record as a whole.

Plaintiff also suggests that the ALJ failed to properly consider the effects of his obesity in combination with his other impairments in accordance with SSR 02-1P.  There is absolutely no merit to the suggestion that the ALJ in this case failed to properly consider plaintiff's obesity.  The ALJ determined that obesity was a severe impairment.  (Tr. 19).  The ALJ referred to treatment notes indicating that plaintiff was obese.  (Tr. 19-26).  The ALJ cited SSR 02-1P, quoted passages therefrom, and wrote: "[t]he effects of the claimant's obesity have been considered in determining the above-stated residual functional capacity for the claimant."  (Tr. 31).  The ALJ also limited plaintiff to sedentary work and included other significant restrictions on his mobility.  (Tr. 29-31).

Review of the ALJ's RFC determination reveals that he properly exercised his discretion and acted within his statutory authority in evaluating the evidence of record as a whole.  Having reviewed the ALJ's decision with the requisite deference, the undersigned concludes that it is supported by substantial evidence on the record as a whole.

For all of the foregoing reasons, on the claims that plaintiff raises, the undersigned determines that the Commissioner's decision is supported by substantial evidence on the record as a whole, and should therefore be affirmed.  Because there is substantial evidence to support the decision, reversal is not required merely because substantial evidence may support a different outcome, or because another court could have decided the case differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir.2001); Browning, 958 F.2d at 821.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 30th day of August, 2013.